RICHARD D. TURNER, Administrator of the Estate of JANE L. TURNER v. DUKE UNIVERSITY, PRIVATE DIAGNOSTIC CLINIC and ALLAN H. FRIEDMAN, M.D.

No. 526A88

(Filed 26 July 1989)

1. **Physicians, Surgeons, and Allied Professions § 19— physician's negligent failure to attend, diagnose and treat— sufficiency of evidence**

   Plaintiff's evidence raised a question of fact for the jury as to whether a hospital patient's death from a perforated colon was proximately caused by defendant attending physician's negligent failure to attend, diagnose and treat the patient's dangerous state of constipation after the patient had been admitted to a medical center for evaluation for a neurosurgical procedure.

   **Am Jur 2d, Physicians, Surgeons, and Other Healers § 228.**

2. **Rules of Civil Procedure § 11— Rule 11(a) sanctions— objective reasonableness standard**

   A subjective showing of bad faith is unnecessary for the imposition of sanctions under N.C.G.S. § 1A-1, Rule 11(a). Rather, the standard under Rule 11(a) is one of objective reasonableness under the circumstances.

   **Am Jur 2d, Depositions and Discovery § 376.**

TURNER v. DUKE UNIVERSITY

[325 N.C. 152 (1989)]

3. **Rules of Civil Procedure § 11— Rule 11(a) sanctions—standard for appellate review**

The trial court's decision to impose or not to impose mandatory sanctions under Rule 11(a) is reviewable de novo as a legal issue. In the de novo review, the appellate court will determine (1) whether the trial court's conclusions of law support its judgment or determination, (2) whether the trial court's conclusions of law are supported by its findings of fact, and (3) whether the findings of fact are supported by a sufficiency of the evidence. If the appellate court makes these three determinations in the affirmative, it must uphold the trial court's decision to impose or deny the imposition of mandatory sanctions under Rule 11(a).

**Am Jur 2d, Appeal and Error §§ 79, 703.**

4. **Rules of Civil Procedure § 11— Rule 11(a) sanctions— appropriateness of particular sanction—abuse of discretion standard**

An "abuse of discretion" standard will be used in reviewing the appropriateness of a particular sanction imposed under Rule 11(a).

**Am Jur 2d, Appeal and Error § 18.**

5. **Rules of Civil Procedure § 26— physician not expert witness— deposition after certain date—court order not violated**

A physician deposed by defendant medical center in Florida was not an expert witness, and the trial court's order requiring the identification and deposition of expert witnesses prior to a certain date was not violated by defendant's deposition of the physician after that date, where the focus of the deposition was the physician's previous treatment of the patient for lung cancer, the physician was not questioned about the standard of the patient's care at defendant medical center, and the physician was not retained by defendant for the purpose of litigation.

**Am Jur 2d, Depositions and Discovery §§ 131, 140.**

TURNER v. DUKE UNIVERSITY

[325 N.C. 152 (1989)]

6. **Attorneys at Law § 7.7; Rules of Civil Procedure § 11— notic-
ing and taking of depositions close to trial—increasing litiga-
tion costs and unnecessary delay—harassment of counsel—
Rule 11(a) sanctions**

In an action to recover for the wrongful death of a hospital
patient based on medical malpractice, defendant medical center's
noticing and taking of the depositions of two physicians, one
in California six days before trial and one in Florida four
days before trial, subsequent to its failure to reveal the ex-
istence of the California physician in response to discovery
requests, as well as the duplicative and cumulative nature
of the Florida physician's testimony, threatened to increase
plaintiff's litigation costs and cause unnecessary delay in the
trial in violation of Rule 11(a). Also, the noticing and taking
of the depositions so close to trial represented an attempt
to harass plaintiff's counsel in violation of Rule 11(a). Therefore,
the trial court should have imposed sanctions on defendant
medical center and/or its counsel pursuant to Rule 11(a).

**Am Jur 2d, Depositions and Discovery §§ 131, 140.**

APPEAL by plaintiff pursuant to N.C.G.S. § 7A-30(2) from a
decision of a divided panel of the Court of Appeals, reported at
91 N.C. App. 446, 372 S.E. 2d 320 (1988), affirming a judgment
entered by *Stephens, J.*, at the 4 August 1987 session of Superior
Court, DURHAM County, and on discretionary review of that same
decision of the Court of Appeals unanimously affirming an order
entered by *Barnette, J.*, at the 20 July 1987 session of Superior
Court, DURHAM County. Heard in the Supreme Court 14 March
1989.

*Leonard T. Jernigan, Jr., P.A., for plaintiff-appellant.*

*Yates, Fleishman, McLamb & Weyher, by Beth R. Fleishman
and Barbara B. Weyher, for defendant-appellee Duke University;
Newsom, Graham, Hedrick, Bryson & Kennon, by E. C. Bryson,
Jr., Joel M. Craig, and Mark E. Anderson, for defendant-appellees
Private Diagnostic Clinic and Allan Friedman, M.D.*

MEYER, Justice.

This is a wrongful death action based on alleged medical malprac-
tice. The evidence presented at trial tended to show the following
facts and circumstances. In 1982, plaintiff's wife, Jane L. Turner,

## TURNER v. DUKE UNIVERSITY

[325 N.C. 152 (1989)]

was diagnosed as having lung cancer, for which she received chemotherapy and radiation treatment. She subsequently developed herpes zoster, or shingles. In time, the shingles disappeared, but Mrs. Turner was left with constant post-herpetic pain in her upper right back. In attempting to find relief for this residual pain, Mrs. Turner saw numerous physicians, but to no avail. She was eventually referred to Dr. Blaine Nashold, a neurosurgeon at defendant Duke University Medical Center ("Duke"), for evaluation as a candidate for a DREZ procedure. This is a neurosurgical procedure in which the appropriate nerves are severed by burning in order to relieve pain. Dr. Nashold in turn referred Mrs. Turner to defendant Dr. Allan H. Friedman, one of Dr. Nashold's partners in the defendant Private Diagnostic Clinic. Dr. Friedman became Mrs. Turner's attending physician.

Accompanied by her husband, Mrs. Turner was admitted to Duke in the afternoon of 25 August 1983. She was examined by Dr. Bruce Woodworth, a urology resident and employee of Duke. On the admission summary, Dr. Woodworth noted that Mrs. Turner had been experiencing constipation and that she had been taking medication to alleviate the problem. Dr. Woodworth conducted a digital rectal examination but found Mrs. Turner's rectum empty and determined that her bowel sounds were normal.

At about 5:00 p.m. the same afternoon, Mr. and Mrs. Turner met with defendant Dr. Friedman. Dr. Friedman explained that it would be necessary for a variety of tests to be performed by various physicians, after which he would consult further with Mr. and Mrs. Turner as to what type of pain relief would be best suited for her condition. Dr. Friedman then left. That evening, Mrs. Turner took two Dulcolax tablets for her constipation, but they had no effect.

On the following morning of 26 August 1983, Dr. Friedman made his morning rounds. Although he stopped at Mrs. Turner's room and looked at her medical chart, he did not enter the room to examine Mrs. Turner because she appeared to be asleep. Upon awakening and throughout the morning, Mrs. Turner complained of constipation and abdominal cramping. At about 11:00 a.m., Dr. Woodworth ordered that Mrs. Turner be given a saline enema to alleviate her constipation. He further ordered that if the enema produced no results, Mrs. Turner was to be given a half bottle of magnesium citrate. If Mrs. Turner experienced no relief, the

second half-bottle of magnesium citrate was to be administered at about 2:00 p.m. Neither the enema nor the first half-bottle of magnesium citrate produced any positive results. Mrs. Turner made numerous unsuccessful attempts to have a bowel movement and continued to complain of abdominal cramping.

The second half-bottle of magnesium citrate was administered at about 2:00 p.m. Mrs. Turner was then transferred to a different wing of the hospital, where patients with neurological complaints were concentrated. Dr. Friedman made his afternoon rounds, but because Mrs. Turner had been moved from her former room, he failed to see her. At about 3:00 p.m., Dr. Robert Havard, an oncologist called upon by Dr. Friedman to evaluate the condition of Mrs. Turner's cancer, visited Mrs. Turner and examined her. Dr. Havard's examination was repeatedly interrupted by Mrs. Turner's trips to the bathroom for unsuccessful attempts to have a bowel movement. Dr. Havard noted on Mrs. Turner's chart that she was experiencing extreme abdominal discomfort as well as nausea and vomiting.

At about 5:00 p.m., plaintiff, who had remained with his wife throughout the day, became increasingly concerned about her abdominal pain. He rang for a nurse and requested that a doctor check Mrs. Turner. Plaintiff was informed that the doctors were making rounds and that they would attend his wife when they reached her room. At 6:00 p.m., the doctors stopped at Mrs. Turner's room, but despite plaintiff's requests, they did not examine Mrs. Turner at that time. Sometime between 7:00 p.m. and 8:00 p.m., plaintiff saw Dr. Woodworth in the hospital hallway and asked him to check his wife. When Dr. Woodworth examined Mrs. Turner, her bowel was distended, she was breathing heavily, and her skin was clammy. He immediately left to order a blood work-up and x-rays and to contact the general surgeon on duty. When Dr. Woodworth returned to Mrs. Turner's room, her blood pressure had dropped. She was unresponsive and in shock. The x-ray revealed the presence of air in the abdominal cavity, which indicated a perforation in Mrs. Turner's colon.

At about 12:00 midnight, Mrs. Turner underwent exploratory surgery, which revealed that her colon was indeed perforated. Mrs. Turner's abdomen was full of stool, and there was a large impaction of fecal matter in her colon. The surgeon determined that Mrs. Turner's intestines were nonsalvageable, and he terminated the

**TURNER v. DUKE UNIVERSITY**

[325 N.C. 152 (1989)]

operation. The surgeon advised plaintiff that nothing could be done to save his wife. Mrs. Turner was pronounced dead at 4:10 a.m. on 27 August 1983. The autopsy report stated that a single acute perforation of the sigmoid colon had led to bacterial peritonitis, sepsis, and death.

Plaintiff instituted this action on 25 July 1985 pursuant to N.C.G.S. § 28A-18.1, alleging that defendants' negligence in the treatment and diagnosis of his wife proximately caused her death on 27 August 1983. At the end of plaintiff's evidence, the trial court granted a directed verdict in favor of defendants Dr. Friedman and the Private Diagnostic Clinic. The jury subsequently returned a verdict in favor of defendant Duke.

Earlier, on 17 July 1987, prior to trial, plaintiff filed a motion for sanctions against Duke pursuant to N.C.G.S. § 1A-1, Rule 11(a), Rule 26(g) and Rule 37, alleging in part (1) that Duke failed to comply with an order instructing it, in answering a set of interrogatories, to provide the names and addresses of persons involved in the treatment of plaintiff's wife as to specific individuals "if requested by plaintiff's counsel at a later date"; (2) that Duke failed to comply with an order instructing Duke to identify all expert witnesses it would offer at trial *before* 17 June 1987; (3) that Duke failed to comply with an order instructing all parties to supplement outstanding interrogatories on or by 1 July 1987; and (4) that Duke noticed *post* 17 July 1987 depositions of two physicians who had treated Mrs. Turner (one located in Florida, and one located in California), whom plaintiff classified as expert witnesses, for an improper purpose and with the intent to harass plaintiff's counsel in contravention of Rule 11(a). After a hearing, plaintiff's motion for sanctions was denied.

Plaintiff appealed to the Court of Appeals both the granting of the directed verdict in favor of Dr. Friedman and the Private Diagnostic Clinic and the denial of the motion for sanctions against Duke. That court, with one judge dissenting, affirmed the directed verdict and unanimously affirmed the denial of the motion for sanctions. Plaintiff appealed to this Court on the issue of the directed verdict, and we granted discretionary review on the issue of the denial of the motion for sanctions. We now reverse the Court of Appeals as to both issues.

I.

[1] We first address plaintiff's contention that the directed verdict in favor of Dr. Friedman and the Private Diagnostic Clinic should

not have been granted. The law with regard to directed verdicts is clear. In determining the sufficiency of the evidence to withstand a motion for a directed verdict, all of the evidence which supports the non-movant's claim must be taken as true and considered in the light most favorable to the non-movant, giving the non-movant the benefit of every reasonable inference which may legitimately be drawn therefrom and resolving contradictions, conflicts, and inconsistencies in the non-movant's favor. *Rappaport v. Days Inn*, 296 N.C. 382, 250 S.E. 2d 245 (1979). Further, this Court has stated:

> [A]fter all the evidence of plaintiff and defendant is in, the court may consider so much of defendant's evidence as is favorable to plaintiff or tends to clarify or explain evidence offered by plaintiff not inconsistent therewith, but it must ignore that which tends to establish another and different state of facts or which tends to contradict or impeach the testimony presented by plaintiff. Otherwise, consideration would not be in the light most favorable to plaintiff.

*Morgan v. Tea Co.*, 266 N.C. 221, 222-23, 145 S.E. 2d 877, 879 (1966). Finally, where the question of granting a directed verdict is a close one, we have said that the better practice is for the trial court to reserve its decision on the motion and allow the case to be submitted to the jury. *Manganello v. Permastone, Inc.*, 291 N.C. 666, 231 S.E. 2d 678 (1977).

At trial and before the Court of Appeals, defendants Dr. Friedman and the Private Diagnostic Clinic successfully argued that plaintiff had failed to produce sufficient evidence on the element of causation to take the case to the jury. Our review of the factual issues in the case with regard to causation compels us to disagree.

First, the record reveals that, on the issue of Dr. Friedman's alleged violation of the accepted standard of care, plaintiff's expert, Dr. William Pace, testified as follows:

Q Let me direct your attention to Dr. Friedman, if I might. After your review of the medical records in this case, have you performed [sic] an opinion satisfactory to yourself and to a reasonable degree of medical certainty as to whether the care and treatment rendered by Allan H. Friedman to Jane L. Turner was in accordance with acceptable standards of practice for physicians with similar training and experience in the same or similar communities of [sic] that

**TURNER v. DUKE UNIVERSITY**

[325 N.C. 152 (1989)]

of Durham, North Carolina in August of 1983. Do you have an opinion?

MR. BRYSON: Objection.

COURT: Overruled. You may answer.

A  Yes, sir.

Q  What is that, sir?

MR. BRYSON: Objection.

COURT: Overruled. You may answer.

A  It was.

Q  Can you explain that to the jury . . .

A  It was in accordance . . . It was a violation, yes.

Dr. Pace testified that since Mrs. Turner was taking Tylenol #4, "the most potent codeine that you can get in Tylenol," which makes the colon stop working and gives the patient constipation, one of the questions that Dr. Friedman should have asked Mrs. Turner was, "[W]hen did your bowels move last?" The evidence shows that neither Dr. Friedman nor anyone else ever asked Mrs. Turner this question.

Dr. Pace's testimony then continued as follows:

Q  Do you have some comments about [Dr. Friedman's] failure to see [Mrs. Turner] on the afternoon of the 26th?

MR. BRYSON: Objection.

COURT: Overruled.

A  He's still her doctor and he's charging her for hospital care. *And a part of that ought to be at least the courtesy of coming to see the patient. Under those circumstances, he may well have been the one doctor to discover that she was in trouble.* And so it certainly was a deviation from proper standards of care of a patient not to see her on the afternoon.

Q  Dr. Pace, after reviewing this medical chart, have you formed an opinion satisfactory to yourself and to a reasonable degree of medical certainty as to whether *the violation of the*

TURNER v. DUKE UNIVERSITY

[325 N.C. 152 (1989)]

*accepted standards of care by Dr. Friedman was a prox-*
*imate cause for the death of Jane L. Turner?*

MR. BRYSON: Objection.

COURT: Overruled.

A I have.

Q And what is that?

MR. BRYSON: Objection.

COURT: Overruled.

A *It was.*

(Emphasis added.)

The testimony quoted above clearly describes a violation by
Dr. Friedman and the Private Diagnostic Clinic of the standard
of care in failing to attend, diagnose, and treat Mrs. Turner. But
this was not the only evidence of causation that plaintiff presented.
Dr. Pace also testified that Mrs. Turner's condition was reversible
after her colon perforated. According to Dr. Pace, defendant Dr.
Friedman should have seen Mrs. Turner between 2:00 p.m. and
8:00 p.m. on 26 August 1983. At that time, Dr. Friedman should
have carefully examined Mrs. Turner's abdomen. Had he done so,
a colostomy could subsequently have been performed which could
have saved Mrs. Turner's life. Such evidence is the essence of
proximate cause. As the dissenting judge in the Court of Appeals
succinctly noted, plaintiff's evidence raised a question of fact as
to whether Mrs. Turner's death was proximately caused by Dr.
Friedman's negligent failure to diagnose and treat his patient's
dangerous state of constipation, as alleged in plaintiff's complaint.

Defendants argue, and the Court of Appeals majority agreed,
that even had Dr. Friedman examined Mrs. Turner on the afternoon
of 26 August 1983, it would have made no difference to the diagnosis
of her condition and that even Dr. Pace, plaintiff's expert, himself
admitted that it probably would not have made a difference. It
is true that on cross-examination of Dr. Pace, the following ex-
change took place:

Q All right. Now, is it not true . . . Let me ask you this.
    If Dr. Friedman had seen Mrs. Turner at 3:00 in the after-
    noon, some thirty minutes before Dr. Havard, the internist,

had seen her? It would not have made any difference to the diagnosis, of her condition, would it?

A We've got to do a hypothetical assumption that Dr. Havard did see her at 3:30 and that Dr. Friedman did try to see her at 3:00 and somewhere in that half an hour she appeared, got into bed and was available for examination. And it wouldn't have made a difference.

Q But I want you to assume . . .

A Very difficult. But all right. I'll assume. It probably wouldn't have made much difference.

Q It would not have made much difference.

A Especially not if he had not examined her.

Q I said he did examine her.

A Oh. I would hope that he would have found signs of a perforated colon.

Q And Dr. Havard, the internist, didn't some thirty minutes later or an hour later?

A I would hope that Dr. Havard would have put it in the record if he had.

Q That was not my question, Dr. Pace.

A All right, sir.

Q My question was, if Dr. Havard, the internist who specialized in internal medicine, . . . didn't pick it up, less chance of Dr. Friedman would have picked it up, is that not true?

A Probably.

However, plaintiff's evidence shows that Mrs. Turner was in distress at 3:30 p.m. when Dr. Havard attempted to examine her, a mere thirty minutes after Dr. Pace was to assume that defendant Dr. Friedman had examined her. According to the medical record, she was complaining of extreme discomfort. Plaintiff himself testified that his wife repeatedly interrupted Dr. Havard's examination as she unsuccessfully attempted a bowel movement. Furthermore, Dr. Pace's answer to the hypothetical question was not conclusive. To assume the facts in this hypothetical question to be true is to construe the evidence in the light most favorable to defendants

Dr. Friedman and the Private Diagnostic Clinic, the movants for the directed verdict in this instance, rather than in the light most favorable to plaintiff, the non-movant. This the law does not permit. *Morgan v. Tea Co.*, 266 N.C. 221, 145 S.E. 2d 877.

When a defendant moves for a directed verdict in a medical malpractice case, the question raised is whether the plaintiff has offered evidence of each of the following elements of his claim for relief: (1) the standard of care, (2) breach of the standard of care, (3) proximate causation, and (4) damages. *Lowery v. Newton*, 52 N.C. App. 234, 278 S.E. 2d 566, *disc. rev. denied*, 303 N.C. 711, --- S.E. 2d ---, *reconsideration of denial of disc. rev. denied*, 304 N.C. 195, 291 S.E. 2d 148 (1981). Causation is an inference of fact to be drawn from other facts and circumstances. *Hairston v. Alexander Tank & Equipment Co.*, 310 N.C. 227, 311 S.E. 2d 559 (1984). Proximate cause is ordinarily a jury question. *Conley v. Pearce-Young-Angel Co.; Rutherford v. Pearce-Young-Angel Co.*, 224 N.C. 211, 29 S.E. 2d 740 (1944). We conclude from the record here that plaintiff presented sufficient evidence to take his case to the jury on the element of causation with regard to defendant Dr. Friedman's failure to diagnose and treat Mrs. Turner's condition, which led to her subsequent death. Accordingly, the Court of Appeals erred in affirming the trial court's directed verdict in favor of defendants Dr. Friedman and the Private Diagnostic Clinic. *Manganello v. Permastone, Inc.*, 291 N.C. 666, 231 S.E. 2d 678.

## II.

We now turn to an issue of first impression in this Court—plaintiff's contention that the Court of Appeals erred in restricting its review of defendant Duke's alleged Rule 11(a) and Rule 26(g) of the North Carolina Rules of Civil Procedure violation to an "abuse of discretion" standard. Our reading of the Court of Appeals' opinion discloses that the Court of Appeals used a "clearly erroneous" standard. Plaintiff argues that the Court of Appeals should have undertaken a *de novo* review.

To resolve the issue, some historical background is necessary. Prior to the 1983 amendment to Rule 11 of the Federal Rules of Civil Procedure, the federal courts had attempted to handle litigation abuse with *discretionary* authority under Rule 37 and the former Rule 11, which provided that if a pleading was not signed or was signed with intent to defeat the purpose of the rule, it could be struck as sham and false. Fed. R. Civ. P. 11 (1983).

## TURNER v. DUKE UNIVERSITY

[325 N.C. 152 (1989)]

A willful violation of the rule could result in appropriate disciplinary sanctions. *Id.* Rule 11(a) of the North Carolina Rules of Civil Procedure contained similar provisions concerning the striking of pleadings as sham and false, but it did not authorize sanctions. *Estrada v. Burnham*, 316 N.C. 318, 325 n.5, 341 S.E. 2d 538, 543 n.5 (1986); N.C.G.S. § 1A-1, Rule 11(a) (Cum. Supp. 1988).

On the federal level, experience revealed that Rule 11 had not been effective in deterring abuses. *See* Wright & Miller, *Federal Practice and Procedure, Civil* § 1334 (1969). Federal judges were reluctant to impose sanctions, primarily because the rule only required a subjective standard of good faith compliance. *Eastway Const. Corp. v. City of New York*, 762 F. 2d 243 (2d Cir. 1985), *cert. denied*, 484 U.S. 918, 98 L.Ed. 2d 226 (1987). Rule 11 was amended, effective 1 August 1983. The Advisory Committee Note on Rule 11 stated that the changes were intended to reduce the reluctance of the federal courts to impose sanctions by emphasizing the responsibilities of attorneys and reinforcing those obligations by the imposition of sanctions. The amended Rule 11 provides in pertinent part:

> The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. . . . If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

Fed. R. Civ. P. 11 (1983). Effective 1 January 1987, North Carolina's Rule 11(a) was also amended. N.C.G.S. § 1A-1, Rule 11(a) (Cum. Supp. 1988). With the exception of one sentence in the federal counterpart not relevant here, N.C.G.S. § 1A-1, Rule 11(a) is identical to the federal rule. Similarly, N.C.G.S. § 1A-1, Rule 26(g) pro-

TURNER v. DUKE UNIVERSITY

[325 N.C. 152 (1989)]

vides that when an attorney or party signs a discovery document, he certifies to the best of his knowledge that it has not been served for an improper purpose and is not unreasonably burdensome or expensive. N.C.G.S. § 1A-1, Rule 26(g) (Cum. Supp. 1988). Violation of Rule 26(g) subjects the attorney or party to mandatory sanctions.

[2] The North Carolina Rules of Civil Procedure are, for the most part, verbatim recitations of the federal rules. *Sutton v. Duke*, 277 N.C. 94, 176 S.E. 2d 161 (1970). Decisions under the federal rules are thus pertinent for guidance and enlightenment in developing the philosophy of the North Carolina rules. *Id*. Cases considering the amended federal Rule 11 have all held that a showing of subjective bad faith is no longer required to trigger the Rule's sanctions. *Stevens v. Lawyers Mut. Liab. Ins. Co. of N.C.*, 789 F. 2d 1056 (4th Cir. 1986); *Zaldivar v. City of Los Angeles*, 780 F. 2d 823 (9th Cir. 1986); *Eavenson, Auchmuty & Greenwald v. Holtzman*, 775 F. 2d 535 (3d Cir. 1985); *Westmoreland v. CBS, Inc.*, 770 F. 2d 1168 (D.C. Cir. 1985); *Eastway Const. Corp. v. City of New York*, 762 F. 2d 243 (2d Cir.). Further, the Advisory Committee Notes contain the following comments:

> The new language stresses the need for some prefiling inquiry into both the facts and the law to satisfy the affirmative duty imposed by the rule. *The standard is one of reasonableness under the circumstances*. This standard is more stringent than the original good-faith formula and thus it is expected that a greater range of circumstances will trigger its violation.

Fed. R. Civ. P. 11 advisory committee's notes (citations omitted) (emphasis added). Guided by the reasoning and uniformity of the federal decisions, we conclude that a showing of subjective bad faith is unnecessary under N.C.G.S. § 1A-1, Rule 11(a). Rather, the standard under our Rule 11(a) is one of objective reasonableness under the circumstances.

In deciding upon the proper standard of appellate review, however, the federal opinions diverge. Some circuits have established a three-tier analysis: (1) the legal conclusion that specific conduct violated Rule 11 is a legal issue reviewable *de novo*, (2) any disputed factual determinations are reviewed under a "clearly erroneous" standard, and (3) the appropriateness of an imposed sanction is reviewed for abuse of discretion. *Brown v. Federation of State Medical Boards of U.S.*, 830 F. 2d 1429 (7th Cir. 1987);

*Zaldivar v. City of Los Angeles*, 780 F. 2d 823 (9th Cir.). Other circuits apply a variation of the three-tiered analysis, using an abuse of discretion standard when reviewing the factual reasons for imposing Rule 11 sanctions and the amount or type of sanctions, while reviewing *de novo* the legal sufficiency of a pleading or motion and the determination to impose sanctions. *Donaldson v. Clark*, 819 F. 2d 1551 (11th Cir. 1987) (en banc); *Westmoreland v. CBS, Inc.*, 770 F. 2d 1168 (D.C. Cir.); *Eastway Const. Corp. v. City of New York*, 762 F. 2d 248 (2d Cir.). Yet others use an "abuse of discretion" standard across the board. *Thomas v. Capital Sec. Services, Inc.*, 836 F. 2d 866 (5th Cir. 1988); *O'Connell v. Champion Intern. Corp.*, 812 F. 2d 393 (8th Cir. 1987); *EBI, Inc. v. Gator Industries, Inc.*, 807 F. 2d 1 (1st Cir. 1986); *Cotner v. Hopkins*, 795 F. 2d 900 (10th Cir. 1986); *Stevens v. Lawyers Mut. Liab. Ins. Co. of N.C.*, 789 F. 2d 1056 (4th Cir. 1986).

[3]   After careful analysis of the rule and the federal decisions, we adopt the following standard for appellate review of the granting or denial of motions to impose mandatory sanctions under N.C.G.S. § 1A-1, Rule 11(a). The trial court's decision to impose or not to impose mandatory sanctions under N.C.G.S. § 1A-1, Rule 11(a) is reviewable *de novo* as a legal issue. In the *de novo* review, the appellate court will determine (1) whether the trial court's conclusions of law support its judgment or determination, (2) whether the trial court's conclusions of law are supported by its findings of fact, and (3) whether the findings of fact are supported by a sufficiency of the evidence. If the appellate court makes these three determinations in the affirmative, it must uphold the trial court's decision to impose or deny the imposition of mandatory sanctions under N.C.G.S. § 1A-1, Rule 11(a).

[4]   Finally, in reviewing the appropriateness of the particular sanction imposed, an "abuse of discretion" standard is proper because "[t]he rule's provision that the court 'shall impose' sanctions for motions abuses . . . concentrates [the court's] discretion on the *selection* of an appropriate sanction rather than on the *decision* to impose sanctions." *Westmoreland v. CBS, Inc.*, 770 F. 2d at 1174; *see also Daniels v. Montgomery Mut. Ins. Co.*, 320 N.C. 669, 360 S.E. 2d 772 (1987).

We conclude that the Court of Appeals erred in employing a "clearly erroneous" standard in reviewing the trial court's denial of plaintiff's motion for sanctions in the case sub judice.

We now review the trial court's determination that N.C.G.S. § 1A-1, Rule 11(a) sanctions were not warranted here under the standard explained above. On 25 April 1986, plaintiff submitted his second set of interrogatories to defendant Duke. Interrogatory number 13 requested Duke to identify any person who had any knowledge about the care and treatment of Mrs. Turner while she was at Duke; to state the substance of that knowledge; and to identify the individual by name, address, telephone number and job title. On 27 May 1986, Duke submitted an answer to interrogatory number 13, in which it stated:

> To the best of defendant's knowledge and belief, all witnesses listed in medical records, a copy of which has been furnished previously to plaintiff's counsel. See medical records for substance of those individuals' knowledge. Also plaintiff.

On 23 July 1986, plaintiff filed a motion to compel Duke to answer interrogatory number 13, among others, directly rather than by reference to the medical records. On 6 August 1986, the trial court entered an order which provided in part:

> As to Interrogatory No. 13, it appearing that the names and addresses of the witnesses were not listed as requested, and although the objection is sustained, defense counsel is directed to provide this information as to specific individuals if requested at a later date by plaintiff's counsel.

On 13 May 1987, plaintiff requested in writing that Duke provide him with the names and addresses of the witnesses requested in interrogatory number 13. Plaintiff received no response to this request.

On 4 June 1987, the trial court ordered all parties to supplement all outstanding interrogatories on or before 1 July 1987. On 1 July 1987, Duke submitted a letter to plaintiff's counsel, in which it listed several witnesses, including one Dr. Havard. No addresses were given, and no information as to the knowledge of these witnesses was provided. On 25 June 1987, defendant Dr. Friedman furnished his supplemental responses to interrogatories to plaintiff's counsel, in which he identified Dr. Robert A. Havard, Visalia, California, address unknown at that time, as a witness.

On 6 July 1987, Duke hand delivered two notices of depositions to plaintiff's counsel. One notice scheduled the deposition of Dr. Robert Havard in California for 21 July 1987 (six days prior to

**TURNER v. DUKE UNIVERSITY**

[325 N.C. 152 (1989)]

trial), and the other scheduled the deposition of Dr. R. P. Scheerer in Florida for 23 July 1987 (four days prior to trial). Dr. Havard was an oncology fellow who had seen Mrs. Turner at Duke, and Dr. Scheerer was an oncologist who had treated Mrs. Turner's cancer in Florida in 1982.

On 17 July 1987, plaintiff filed his motion for sanctions under N.C.G.S. § 1A-1, Rules 11(a), 26(a) and 37(b). Plaintiff sought an order (1) that the notices and depositions of Dr. Havard and Dr. Scheerer be struck as sham and the depositions not be allowed into evidence; (2) that the defensive pleadings of Duke be struck and a default judgment be entered against it; (3) that plaintiff's expenses, including attorney's fees in preparing and arguing the motion for sanctions, be taxed to Duke or its attorneys; and (4) for such other and further relief as the trial court deemed just and proper. At the hearing on 20 July 1987, plaintiff read Rule 26(g) into the record. After hearing arguments of counsel, the trial court denied plaintiff's motion in its entirety. The Court of Appeals affirmed the trial court's denial of plaintiff's motion.

In this case, we focus upon the trial court's conclusion of law that Duke's noticing and scheduling of the depositions of Dr. Scheerer and Dr. Havard did not amount to conduct sufficient to trigger the mandatory sanctions of N.C.G.S. § 1A-1, Rule 11(a).

Plaintiff posits four reasons to support his argument that Duke's conduct in this case warranted sanctions under Rule 11(a): (1) that Dr. Scheerer was an expert witness and that Duke failed to disclose his identity in a timely manner, (2) that Duke failed to identify Dr. Havard in response to other discovery requests, (3) that the doctors' depositions threatened to cause a needless increase in the cost of litigation and an unnecessary delay, and (4) that the depositions were noticed for an improper purpose, that is, to disrupt his counsel's trial preparation. We conclude that three of these assertions have merit and, in combination, suffice to trigger the mandatory sanctions clause of Rule 11(a).

[5] The Court of Appeals correctly disposed of plaintiff's first assertion that Dr. Scheerer was an expert witness. Dr. Scheerer had treated Mrs. Turner for her lung cancer in Florida. As the Court of Appeals noted, perusal of the record reveals that the purpose of Dr. Scheerer's deposition was to elicit the doctor's personal observations as to Mrs. Turner's medical condition. The focus of his deposition was his treatment of Mrs. Turner. Although, by

general definition, all doctors may be considered experts in that they possess a specialized knowledge of medicine beyond that of the layman, not every role of a doctor as a witness in a legal controversy is in the capacity of an "expert" witness. N.C.G.S. § 1A-1, Rule 26(b)(4) governs discovery of facts known and opinions held by experts. The commentary to this Rule reads as follows:

> Subsection (b)(4)—Trial Preparation; Experts.—This is a new provision dealing with discovery of information (including facts and opinions) obtained by a party from an expert *retained* by that party in relation to litigation or obtained by the expert and not yet transmitted to the party. The subsection deals with those experts whom the party expects to call as trial witnesses. It should be noted that the subsection does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit. *Such an expert should be treated as an ordinary witness.*

N.C.G.S. § 1A-1, Rule 26(b)(4) comment (1983) (emphasis added). Where a doctor is or was the plaintiff's treating physician and is called to testify not about the standard of the plaintiff's care but rather about the plaintiff's treatment and the doctor's choice of surgical procedures, he is not an expert witness. *See Sheahan v. Dexter*, 136 Ill. App. 3d 241, 483 N.E. 2d 402 (1985). Here, Dr. Scheerer was not questioned about the standard of Mrs. Turner's care at Duke. Further, Duke did not retain Dr. Scheerer for the purpose of litigation. He personally treated plaintiff's wife, and his knowledge of her case arose before her death and before this litigation. *See Tzystuck v. Chicago Transit Authority*, 124 Ill. 2d 226, 529 N.E. 2d 525 (1988); *Krug v. United Disposal, Inc.*, 567 S.W. 2d 133 (Mo. App. 1978). Duke properly listed Dr. Scheerer as "an ordinary witness." The Court of Appeals correctly concluded that in deposing Dr. Scheerer after 17 July 1987, Duke did not violate the order requiring identification and deposition of expert witnesses prior to that date.

[6] Plaintiff, however, presents three further grounds for his argument that the trial court should have imposed sanctions upon Duke. We believe that these grounds are meritorious.

As outlined above, after Duke had referred plaintiff to Mrs. Turner's medical records for identification of witnesses it might call,

## TURNER v. DUKE UNIVERSITY

### [325 N.C. 152 (1989)]

the trial court entered an order on 6 August 1986 upon plaintiff's motion, in which it ordered Duke to provide the names and addresses of witnesses and "to provide this information as to specific individuals if requested at a later date by plaintiff's counsel." On 13 May 1987, plaintiff requested Duke to comply with this order. Duke failed to respond. On 2 July 1987, plaintiff received a letter from counsel for Duke which listed several witnesses but failed to provide their addresses or other information. Dr. Havard was identified as a witness for the first time in this letter. Counsel for Dr. Friedman identified Dr. Havard for the first time when he supplemented his answers to interrogatories on 26 June 1987, but he could not supply his address. On 6 July 1987, Duke noticed Dr. Havard's deposition in California for 21 July 1987, a mere six days prior to trial.

Duke argues that the wording in the trial court's order should be interpreted to mean that Duke was required to supply information only if it were asked about a specific individual identified *by plaintiff*, and that Dr. Havard's signature was part of Mrs. Turner's medical records. This argument is disingenuous. A more logical interpretation of the order's somewhat ambiguous language is that Duke was directed to provide information as to specific individuals *whom Duke intended to present as witnesses* if requested to do so at a later date by plaintiff's counsel. Duke presumably knew who its witnesses were. Furthermore, the only identification of Dr. Havard in Mrs. Turner's medical records is in the form of an illegible signature at the bottom of one page of notes. It defies logic to argue that plaintiff should have been expected to decipher an illegible signature in order to make a request for information from Duke concerning that specific individual. In short, plaintiff requested Duke to comply with the trial court's order, but Duke failed to do so. We need not address plaintiff's contention that Duke's conduct smacks of an improper attempt to conceal Dr. Havard's existence from plaintiff.

Plaintiff also argues that Duke violated Rule 11(a) in that the noticing and taking of the depositions of Dr. Scheerer and Dr. Havard threatened a needless increase in litigation costs and an unnecessary delay. At the hearing on plaintiff's motion for Rule 11(a) sanctions, Duke argued to the trial court that Dr. Scheerer's deposition testimony was needed because plaintiff was going to introduce at trial the issue of whether Mrs. Turner's cancer was resectable. Plaintiff's expert witness, Dr. Pace, would testify that in

TURNER v. DUKE UNIVERSITY

[325 N.C. 152 (1989)]

fact Mrs. Turner's cancer *was* resectable. Since Duke's expert witness, one Dr. Ozer, would only be giving testimony about Mrs. Turner's life expectancy, Dr. Scheerer would testify as to his decision not to resect Mrs. Turner's cancer. The record reveals, however, that Dr. Ozer did indeed express his expert opinion as to resectability. In his deposition, the following exchange took place:

Q And you say the reason [Mrs. Turner's cancer] was nonresectable was what, now?

A It was adherent to the mediastinum and so, they could not develop what was called a plane between the tumor and the mediastinum itself.

And at trial, Dr. Ozer testified as follows:

Q Well, doctor, when the tumor crosses the line into the mediastinum, can it be resected or removed?

A It cannot. The only way that one could do that would be to divestate the patient by surgical manipulation and by removal of major organs that it's virtually impossible and doesn't really benefit the patient.

Dr. Scheerer's testimony was thus duplicative and cumulative of Dr. Ozer's expert opinion.

Duke points out that at the hearing on plaintiff's Rule 11(a) motion, plaintiff declined the trial court's suggestion that the depositions be taken by telephone. Duke argues that plaintiff could have reduced costs by accepting this suggestion, since plaintiff's counsel would not then face the expense of flying to California and Florida. The record shows that plaintiff's counsel stated that he did not think telephone depositions would be appropriate under the circumstances. We see no fault in plaintiff's reluctance to accept the suggestion, since the thrust of plaintiff's motion under Rule 11(a) was that the violations by Duke *had already* taken place. The trial court's suggestion would more properly have been directed to the mandatory sanctions clause of Rule 11(a). It was not dispositive of the threshold issue of whether a Rule 11(a) violation had occurred. Duke also argues that plaintiff specifically objected to any continuance of the trial. Since the trial had already twice been continued and was imminent, plaintiff's objection to a further delay seems consonant with the language of Rule 11(a) providing that a violation occurs when a pleading, motion or other paper is inter-

TURNER v. DUKE UNIVERSITY

[325 N.C. 152 (1989)]

posed for the improper purpose of causing unnecessary delay. We conclude that Duke's noticing and taking of the depositions of Dr. Havard and Dr. Scheerer so close to trial, subsequent to the failure to reveal the existence of Dr. Havard, as well as the duplicative and cumulative nature of Dr. Scheerer's testimony, threatened to increase plaintiff's litigation costs and cause unnecessary delay of the trial in violation of Rule 11(a).

Finally, we note that Dr. Havard's deposition, in California, was scheduled for 21 July 1987, six days prior to trial, and Dr. Scheerer's for 23 July 1987, in Florida, four days prior to trial. Plaintiff quite reasonably argues that these dates would have required him to be absent from his office for at least four of the five business days remaining before the start of the trial on 27 July 1987 and, concomitantly, cut into time reserved for final trial preparation. Both depositions were short: Dr. Havard's consists of fourteen pages of testimony, and Dr. Scheerer's consists of fifteen pages. Had plaintiff's counsel attended these depositions, he would have been unable to attend conscientiously to the needs of his client in preparing for trial. The inference that the noticing and taking of the depositions of Dr. Havard and Dr. Scheerer represents an attempt to harass plaintiff's counsel in violation of Rule 11(a) is not difficult to make. In short, our reading of the record in this case convinces us that several violations of Rule 11(a) occurred here. Since the sanctions clause of Rule 11(a) is mandatory, the trial court should have imposed sanctions on Duke and/or Duke's counsel. Accordingly, the Court of Appeals erred in affirming the trial court's denial of plaintiff's motion for sanctions under N.C.G.S. § 1A-1, Rule 11(a).

We hold that the Court of Appeals erred in affirming the trial court's directed verdict in favor of defendants Dr. Friedman and the Private Diagnostic Clinic and in affirming the trial court's denial of plaintiff's Rule 11(a) motion for mandatory sanctions against Duke. The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further remand to the Superior Court, Durham County, for proceedings consistent with this opinion.

Reversed and remanded.